FILED

2008 Jun-30  PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

KENDRA L. FINLEY,                )

           Plaintiff,        )

vs.                                        )     CV 07-J-1164-S

                            )

AMERICAN TUBE
MANUFACTURING, INC.,        )

           Defendant.        )

## MEMORANDUM OPINION

Pending before the court is defendant American Tube Manufacturing, Inc.'s motion for summary judgment (doc. 36). Defendant filed evidentiary submissions in support of said motion (docs. 37-42) and a brief (doc. 43). Plaintiff filed a response in opposition to defendant's motion for summary judgment (doc. 54), and evidentiary submissions (doc. 52-53 ). Defendant filed a reply to plaintiff's opposition (doc. 64). Having considered all the pleadings and submissions, the court concludes that defendant's motion for summary judgment is due to be granted as no genuine issues of material fact remain and defendant is entitled to a judgment in its favor as a matter of law.

### I.  Procedural Background

Plaintiff filed this action against American Tube Manufacturing, Inc., ("American Tube") on June 20, 2007, seeking injunctive relief and an award of damages under Title VII of the Civil Rights Act of 1964 as amended (42 U.S.C. § 2000e *et seq.*). Plaintiff is alleging sexual discrimination (Count I) and retaliation

(Count II).  On July 2, 2007, plaintiff amended her complaint adding two exhibits,
Exhibit A being a copy of the charge plaintiff filed with the EEOC on October 4,
2006, and Exhibit B being a copy of the EEOC's Dismissal and Notice of Rights.
Defendant filed an answer to the Amended Complaint.

## II.  Factual Background

American Tube is an industrial supplier of steel tubing.  Witherstine decl. ¶
3.  Defendant's business is based on the supply and demand of its customers'
needs, and its business may fluctuate from week to week.  *Id.* ¶ 7.  Dempsey decl.
¶¶ 5, 6.  In the past, this fluctuation would result in a regular cycle of employee
lay-offs and subsequent re-hires based on the production need and customer
demand.  Witherstine decl. ¶ 8.  This practice led defendant to the decision to start
using temporary employees so that its core workforce would not have to change.
*Id.*

In May 2006 American Tube entered a contract with Industrial Staffing of
Alabama (hereinafter "Industrial Staffing") to provide supplemental temporary
staffing during those high productivity times.  *Id.* ¶ 9.  Pursuant to their agreement,
American Tube would contact Industrial Staffing when additional help was
needed, and provide them with the requisite skill level or experience needed to
perform the job.  *Id.* ¶ 10.  Industrial Staffing would use that information to
identify the appropriate individuals from within their pool of candidates, advise

them of the available work assignment, and then instruct the individuals to report to American Tube to perform the job. *Id.* ¶ 10.  Industrial Staffing would conduct employee intake, perform drug testing, and prepare all personnel paperwork. *Id.* ¶ 12, Finley depo. Exh. 3 at 00109.

For some jobs, American Tube was willing to train the temporary workers, while other positions required a minimum skill level.  Dempsey depo. at 32-34, 108.  Though American Tube has had occasion to fill vacant full time positions in the company with temporary employees,  temporary workers are never guaranteed full-time employment with the company.  Witherstine decl. ¶ 15.

On or about July 26, 2006, plaintiff was referred to American Tube for a temporary job assignment by Industrial Staffing.  Finley depo. at 27, 31-32, Exh. 3 at 00125, Dempsey decl. ¶ 4.  Finley was employed by Industrial Staffing, was provided with Industrial Staffing's employment guidelines, and reported to its office to pick up her paycheck weekly.  Finley depo. at 27, 31-32, 34-36, 235; Exh. 3 at 00106-00111.  Industrial Staffing's "*Policies and Procedures Checklist*" states, "I understand that I am an employee of Industrial Staffing and only Industrial Staffing or I can terminate my employment."  Finley depo. Exh. 3 at 00107.  Finley also signed a statement that included Industrial Staffing's harassment policy.  It said, "I understand that Industrial Staffing is committed to principle [sic] of a dignified work environment and prohibits all forms of

harassment, to include, but not limited to sexual, racial, religious, or ethnic harassment.  Anyone believing that they are the recipient of such harassment should notify the Industrial Staffing management immediately."  Finely depo. Exh. 3 at 00101.

Finley was assigned to work as a crane operator in the Shipping Department, where she worked the 3:00 p.m. to 11:00 p.m. shift ("second shift" or "night shift").  Finley depo. at 33-34, 49, 67.  Plaintiff was unavailable to work the day shift because of her childcare arrangements.  Finley depo. at 50.  Finley had no prior experience as a crane operator, but was trained on the job after she started with defendant.  Finley depo. at 55-56, Dempsey decl. ¶ 2.  She reported to Robert Dempsey, the supervisor of the Shipping Department, who oversaw all crane operators and forklift drivers.  Finley depo. at 39, 59-60, Dempsey depo. at 105.  Though crane operators and forklift drivers all fell under the Shipping Department, the employees were assigned individually to support different departments within the plant as part of a production team.  Dempsey depo. at 75-76; Dempsey decl. ¶¶ 3-4.  Finley worked with the Recut/Saw Department where she was responsible for transporting and stacking the steel bundles that were used by the saw operators in order to fill customer orders.  Dempsey decl. ¶ 4, Wilson depo. at 61.

At the time of the plaintiff's assignment, Efferman Moore ("Moe") was the

night shift team leader for the Recut/Saw Department.  Finley depo. at 70-71.

Aubrey Messer was the Recut/Saw Department manager.  Dempsey depo. at 14.

Although Moore was lead man/team leader on second shift and plaintiff may have

assumed Moore was her supervisor, she was never told that he was her supervisor.

Finley depo. at 59-60.[1]  She was specifically told to report to Dempsey. Finley

depo. at 39.  Dempsey was a first shift employee but would stay over to second

shift and see plaintiff before he left. Dempsey depo at 12, 63.  The second shift

supervisor was Michael Grambling who oversaw all departments on his shift.

Witherstine decl. ¶ 29.  All department supervisors reported to Ken Day, who was

Plant Manager of American Tube at the time.  Finley depo. at 71, Dempsey depo.

at 14.

Team leaders are not members of management.  A team leader instructs the

employees on what to do, but if an employee fails, the team leader can only report

it to his or her supervisor.  Jackson depo. at 9.  Team leaders are not utilized in

every department.  Dempsey depo. at 24-25.  A team leader is not authorized to

make any decisions regarding an individual's employment, including hiring,

termination or carrying out disciplinary actions.  Jackson depo. at 33-35.

---

[1]The lead man is responsible for whatever the supervisor gives him to do on the work orders and is responsible for getting the orders out. He instructs the employees in that department what needs to be done. Moore depo. at 35. A lead man cannot discipline a co-employee who is performing poorly, but only report such poor performance to a supervisor. *Id.* at 43.

*Plaintiff's Harassment Allegations*

Immediately after plaintiff began working on July 26, 2006, she was assigned to work alongside the Recut/Saw Department where Efferman Moore was the team leader.  Six other employees were also working on this team.  Finley depo. at 59-61.  On the first day, plaintiff did not have a ride home when her shift ended around 11:00 p.m. and Moore offered to take her home.  Finley depo. at 114-115.  Plaintiff and Moore exchanged friendly conversation, with both sharing information about their marital status and their kids.  Finley depo. at 116-118. Plaintiff admits that nothing inappropriate occurred during the car ride.  Finley depo. at 117.

According to plaintiff, while working together later on in late July or early August, plaintiff and Moore were having a conversation about Moore's girlfriend when he commented that his girlfriend looked young for her age.  Finley depo. at 106-107.  Moore then used his cell phone to show plaintiff a picture of his girlfriend, where she was wearing only a bra and panties.  *Id.* at 106-108.  Plaintiff admits that the woman in the picture was not exposed, and that she was covered in a way comparable to a two-piece swimsuit.  Finley depo. at 185, 187.  After plaintiff questioned Moore about showing her the picture, Moore put the picture away and never showed it to her again.  Finley depo. at 108.  They just continued working.  *Id.*

This was the first incident of alleged sexual harassment by Moore.  Finley

depo. at 105-107.

The next incident occurred a couple of days later while plaintiff was in the

work area having a conversation with a male co-worker, Cornelius Wilson, about

different ways Wilson's girlfriend liked sex and plaintiff was telling Wilson about

her and her husband.  Finley depo. at 109-113.  Moore approached them after

overhearing Wilson and plaintiff exchange anecdotes about the different types of

ways they prefer sex with their partners.  *Id.*  Moore interrupted the conversation

and allegedly commented to Wilson, "I wonder how she is in bed."  *Id.* at 112.

Plaintiff states that Moore also remarked that "her butt looks soft" and "looks can

be deceiving."  *Id.* at 110.  Plaintiff told Moore that she didn't think her husband

would approve of what he said, and she then continued working.  *Id.* at 111.

Wilson denies hearing these remarks or any other sexually inappropriate

comments by Moore to the plaintiff.  He also denies having had any conversation

with plaintiff that was sexual in nature.  Wilson depo. at 31, 39.[2]

This  was the last incident of sexually inappropriate behavior alleged by

plaintiff.[3]  Finley depo. at 118-119.

---

[2]About the same time, shortly after plaintiff began working at defendant's plant, Moore complained to Aubrey Messer that plaintiff was too slow and that she was not doing the things he asked her to do in the way he asked her to do them. Moore depo. at 79.

[3]Plaintiff argues that Moore's "staring at her" is sexually inappropriate conduct. Plaintiff's memorandum at 3, 20. However, plaintiff herself never testified that she considered "the staring" sexually inappropriate conduct, and she never complained to defendant that she considered it sexually inappropriate conduct. Rather, plaintiff described it as Moore "picking on

*Plaintiff's First Complaint*

On or about August 3, 2006, plaintiff and Moore had a heated verbal exchange after Moore asked plaintiff to speed up her pace, and they both ended up in Mike Grambling's office, the night shift supervisor.  Finley depo. at 130-138.  Moore complained to Grambling that plaintiff was refusing to follow his instructions and was using profanity.  *Id.*  Plaintiff objected to the cursing accusation and repeatedly called Moore a liar.  *Id.*  In her deposition, Finley testified that she then told Grambling, and an unknown person whom plaintiff calls "Shannon" or "Shelby," that she felt Moore was trying to get her fired because she rejected his sexual advances.  *Id.* at 130, 139-140.  After the meeting plaintiff went back to her work area and finished what she was doing.  *Id.* at 131-132.  There was no more communication between plaintiff and Moe that evening.  *Id.* at 132.

The next day, August 4th, plaintiff was contacted by Industrial Staffing and told not to return to American Tube due to a confrontation that had occurred the previous evening.  Finley depo. at 133.  Plaintiff then called her supervisor at American tube, Robert Dempsey, and asked if she could meet with him and Ken Day to tell her side of the story about what had occurred the previous night with Moore.  Finley depo. at 133-134, Dempsey depo. at 48-49.  Dempsey and Day

---

her."  Finley depo. at 136, 148-149.

immediately agreed to meet with plaintiff that same morning.  Dempsey depo. at 49, Finley depo. at 134.  After hearing plaintiff's account of the alleged confrontation involving Moore, the decision was made to bring plaintiff back to work the same day.  Finley depo. at 168.

Plaintiff did not report the photograph incident to anyone other than two co-workers, her mother and her attorney.  Finley depo.,at 120-121.  Plaintiff did tell Dempsey and Day that she felt Moore would "lie on her" because she would not accept his sexual advances.  *Id.* at 142.  Plaintiff also told them that Moore had made sexual comments like how soft her butt looked and he wondered how good she was in bed. Finley depo. at 142-143.  Ken Day and Dempsey replied that "we don't tolerate that stuff here and we will take care of it." *Id.* at 143.  Plaintiff also believes she told them that Moore "followed me around, you know, peeking at me."  Finley depo. at 143, 144.

Day let plaintiff know that sexually inappropriate behavior would not be tolerated at American Tube, and that the matter would be addressed.  Finley depo. at 143.  Finley was immediately rehired and reported to work the next day.  Finley depo. at 145.  Thereafter Dempsey checked daily with plaintiff to make sure that everything was okay.  Dempsey depo. at 63.  Finley never reported any other misconduct to her employer, Industrial Staffing.  Finley depo. at 176-177.  She did not experience anymore inappropriate sexual behavior by Moore after the August

4th meeting.  Finley depo. at 140, 145-147.

*Plaintiff's Second Complaint*

Plaintiff's next complaint about Moore did not occur until on or about

August 23, 2006, when she went to Gary Williams, the night shift Shipping

Supervisor to report an incident involving Moore staring at her and picking on her

while they were working.  Finley depo. at 150, 152.  That evening, Williams called

Aubrey Messer to notify him that plaintiff had gotten upset after Moore had stared

at her while she was moving a bundle to a saw operator's table and had tried to get

her to work faster.  Witherstine decl. Exh. E, Finley depo. at 148-49.  Messer

returned to the plant to investigate the issue, and he instructed the plaintiff, Moore,

Darian Pugh, and Cornelius Wilson to all prepare a handwritten statement of what

had occurred.  Witherstine decl. Exh. E, Finley depo. at 150-152.  Messer then

contacted Ken Day, and it was decided that Moore and Finley would be sent home

for the rest of the evening, and were to report back at 8:00 a.m. for a meeting to

discuss the incident.  Finley depo. at 157-159, Dempsey depo. at 72-73.

Plaintiff's written complaint described that while she was moving bundles

from a table, Moore was "standing there looking" at her while she was working.

Finley depo. Exh. 6, Wilson depo. at 49.  Plaintiff stated to Messer when asked by

him what was going on: "I'm just tired, you know, it's like he's picking on me ...

it's like he's rushing me through it..."  Finley depo. at 152.  Plaintiff was never

disciplined and never lost any job duties.  Finley depo. at 146.  Her only complaint was that Moore gave her an "irritating stare" while rushing her to complete her job assignments.  Finley depo. at 152, 218.

Although plaintiff had not complained about any sexual misconduct on Moore's part to Day and Messer, Moore was immediately transferred to the day shift beginning on August 25, 2006, and plaintiff's new team leader became Vanessa Jackson, who was transferred from the day shift.  Finley depo. at 160-161; Jackson depo. at 10.  Moore and Finley never worked together again, and plaintiff did not allege any further harassment by Moore.  Finley depo. at 161.

*Plaintiff's Temporary Assignment Ends*[4]

In September 2006 American Tube began experiencing a significant downturn in its production demands.  Witherstine decl. ¶ 27, Dempsey decl. ¶ 6. The company stopped operating one of the mills.  Witherstine decl. ¶ 27, Dempsey depo. at 96.  The workforce needed to be cut back.  Plaintiff was hired in July 2006, during a time when the company was extremely busy and needed a lot of assistance to complete its loads.  Dempsey decl. ¶ 4.  From March 2006 to July 2006, American Tube averaged over 11 million pounds of shipping each month. In August, however, the workload slowed down significantly to just under 9

---

[4]Plaintiff argues that she was terminated twice. Plaintiff's memorandum at 17. Plaintiff testified that Industrial Staffing, not defendant, told her not to report to work after the first confrontation. Finley depo. at 133, 141- 44. After plaintiff talked to Dempsey and Day she came right back to work. *Id.*

million pounds.  Dempsey decl. at ¶ 5, Exh. 1.  In September 2006 the workload

dropped even further, down to 7.8 million pounds.  *Id.* at ¶ 6.  In less than six

months, production had dropped by approximately 3.5 million pounds.  *Id.*  It was

therefore determined that some of the temporary employees would be laid off.

Ken Day met with the department supervisors and determined which job positions

in each department would be cut back.  Dempsey depo. at 95-96, Dempsey decl. ¶

7.  If the position was filled with a temporary employee, then the temporary

worker would be released.  As various positions were cut back, an effort was made

to reassign those employees who were regular full-time employees into positions

that were being kept.  The number of crane operators and forklift drivers was

reduced.[5]  Dempsey decl. ¶ 7.

Day determined that it was no longer economically feasible to have a

dedicated crane operator to support the Recut/Saw Department at night so that

position was eliminated and the saw operators became responsible for transporting

their own materials.  Dempsey decl. ¶ 8.  Since plaintiff held that position, her

temporary assignment ended.  *Id.*  Between September 18 and September 27,

American Tube released a total of seven temporary employees.  Witherstine decl.,

Exh. D.  Four of those employees were released from the Shipping Department on

---

[5]Of all the temporary workers in the Recut/Saw Department who were assigned to work at defendant's plant from January 2006 through March 31, 2008, only two worked on the second shift.  One worked from January 25, 2007 through February 7, 2007, the other worked from February 14, 2007 until February 28, 2007.  Plaintiff Exh. H. Plaintiff could not work first shift due to her childcare issues. Finley depo. at 50.

September 25th, which included the plaintiff.  *Id.*  The other three employees were male.  *Id.*

No one was placed in the position previously held by plaintiff, and in fact, the saw operators continue to move their own materials to this day.  Dempsey decl. ¶ 9, Wilson depo. at 53-54.  At the time plaintiff was employed, the night shift team for the Recut/Saw Department was comprised of six employees.  Finley depo. at 60, Wilson depo. at 52-53.  Shortly after plaintiff was laid off, the entire department was reduced to two people.  Wilson depo. at 52-53.  Within weeks after Finley was released, Moore was transferred to Mill #1 and Wilson moved to Mill #2.  *Id.* at 51-52.  The decline in production ultimately led to the elimination of Aubrey Messer's department supervisor position as well as Grambling's position.  Witherstine decl. ¶¶ 29, 30; Moore depo. at 39-40.

American Tube never instructed anyone at Industrial Staffing that plaintiff could not be reassigned to American Tube.  Dempsey testified plaintiff is currently not precluded from being considered for a job with American Tube.  Dempsey depo. at 88, 107.

### III.  Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of

law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  As the Supreme Court

has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against
> a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which
> that party will bear the burden of proof at trial.  In such a situation,
> there can be "no genuine issue as to any material fact," since a
> complete failure of proof concerning an essential element of the non-
> moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23.  The party moving for summary judgment

always bears the initial responsibility of informing the court of the basis for its

motion and identifying those portions of the pleadings or filings which it believes

demonstrates the absence of a genuine issue of material fact.  *Id.* at 323.  The

burden then shifts to the nonmoving party to "go beyond the pleadings and by ...

affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro. 56(e).  In meeting this burden the

nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine

issue for trial."  Fed. R. Civ. Pro. 56(e); *Matsushita*, 475 U.S. at 587.  *See also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case ...  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000), quoting *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995).  A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment.  *Brown v. American Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir. 1991).  However, the court should not make credibility determinations, nor weigh the parties' evidence.  *See Stewart v. Booker T. Washington Ins.,* 232 F.3d 844, 848 (11th Cir. 2000).

### IV.  Legal Analysis

The plaintiff brings claims for sex discrimination and retaliation based on the above set of facts.  The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence.  *Frederick v. Sprint/United Management Co.,* 246 F.3d 1305, 1311 (11th Cir. 2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

*Sexual Harassment/Hostile Work Environment*

To determine whether an actionable sexual harassment/hostile work

environment claim exists, the court looks to all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 2074 (2002).  An employee cannot recover under the hostile work environment theory unless she shows that (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment; (3) the harassment was based on her membership in a protected group; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis for holding the employer liable.  *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1143 (11th Cir. 2008).  *See also, Pipkins v. City of Temple Terrace, Florida*, 267 F.3d 1197, 1199 (11th Cir. 2001).

The three identifiable incidents of alleged sexual harassment simply do not rise to the level of harassment that is "sufficiently severe or pervasive enough to alter the terms and conditions of employment." *Reeves,* 525 F.3d at 1143.

Title VII is neither a "general civility code," *Oncale v. Sundowner Offshore Svcs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1002 (1998),  nor "designed to purge the workplace of vulgarity." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1251 n. 9 (11th Cir.1999).  Plaintiff's three reported instances of misconduct:  (1) being

shown a cell phone picture of a woman in underwear; (2) being told she has a "nice butt"; and (3) the comment "I wonder what she is like in bed" made by Moore to plaintiff's coworker in plaintiff's presence, fall far short of demonstrating the requisite severity or pervasiveness required to maintain a claim. The "severe or pervasive" element "includes a subjective and objective component." *Mendoza*, 195 F.3d at 1246. The court accepts the plaintiff's assertion that she subjectively perceived the harassment to be severe. The objective severity of the harassment must be judged from the perspective of a reasonable person in plaintiff's position, considering the totality of the circumstances rather than the acts in isolation. *Reeves*, 525 F.3d at 1145. The Supreme Court has identified the following factors to guide an analysis of this issue: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or a merely offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's job performance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 2283 (1998). *See also Mendoza*, 195 F.3d at 1246. *Oncale,* 523 U.S. at 81, 118 S.Ct. at 1003 ("The prohibition of harassment on the basis of sex ... forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment"). The purpose of the "severe or pervasive element" is to "filter out complaints attacking the ordinary tribulations of the workplace, such as the

sporadic use of abusive language, gender-related jokes, and occasional teasing."
*Reeves,* 525 F.3d at 1145 (quoting *Faragher*, 524 U.S. at 788, 118 S.Ct.at 2284
(internal quotation marks omitted)). The element is only satisfied, moreover,
"[w]hen the workplace is permeated with discriminatory intimidation, ridicule and
insult." *Reeves,* 525 F.3d at 1145 (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. at
370).

Applying that guide to this case, the instances about which plaintiff
complains simply do not meet this standard. A single incident of harassment if
sufficiently severe can give rise to a viable Title VII claim. *Reeves,* 525 F.3d at
1146 n. 4. However, showing a picture of a girl in underwear is no more than a
person can see in a newspaper, magazine, or television on a daily basis. The other
incident was a stand-alone incident preceded by plaintiff's conversation in
Moore's presence with another co-worker in the plant of a pretty specific sexual
nature. Plaintiff's immediate reaction to Moore's comment at that time was to tell
him she did not think her husband would approve of what he said. Plaintiff then
continued working. Finley depo. at 111.

These were the only incidents complained of by plaintiff during her two
month assignment to defendant's plant.

Furthermore, the plaintiff has failed in her burden to show that once her
employer had notice of the alleged harassment, it failed to take immediate and

appropriate corrective action.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278-80 (11th Cir. 2002); see also  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997) (requiring employers to take "prompt remedial actions" in response to harassment).  Even assuming that the facts of this case demonstrate sexual harassment, the facts further show that the defendant took the plaintiff's complaints seriously and attempted to put an end to the incidents.

Once plaintiff complained to defendant, plaintiff's supervisor, Robert Dempsey, checked with plaintiff daily to make sure everything was okay. Dempsey depo. at 63.  When plaintiff complained the second time, which was a complaint that Moore was staring at her and rushing her to do her work, defendant transferred Moore to a different shift from plaintiff's and furnished plaintiff with a female team leader.[6]  Finley depo. at 160-161.  Plaintiff and Moore never worked together again and no additional harassment of plaintiff by Moore occurred. Finley depo. at 161.

*Retaliation*

The elements for a prima facie case of retaliation are that (1) the plaintiff engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal connection between the protected activity and the adverse employment

---

[6]In spite of plaintiff's arguments otherwise, staring in and of itself is not sufficient to establish "severe or pervasive" sexual harassment.  See e.g., Mendoza v. Borden, Inc.  195 F.3d 1238, 1249 and n. 8 (11th Cir.1999).

action exists.  *Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).  *See also Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (citing *Meeks v. Computer Associates Int'l.*, 15 F.3d 1013, 1021 (11th Cir. 1994).

There is no evidence that supports plaintiff's contention that the prior harassment complaints were in any way associated with the temporary lay-offs. Defendant's evidence supporting defendant's lay-off decisions is simply undisputed.  There is no evidence that Ken Day's decision to lay off and terminate plaintiff's temporary position was influenced by anything other than a decline in production and customer demands.  Further, there is no evidence that Moore influenced, either directly or indirectly, Day's lay-off decisions.  There is no evidence that either Moore or Messer played any role in determining which positions would be terminated and which would not.  Further there is no evidence of any pretextual motive on the part of defendant.[7]

Where a plaintiff has failed to establish a *prima facie* case, no further inquiry is required in order to grant summary judgment.  Nevertheless, even if

---

[7]Plaintiff argues that Ken Day's e-mail of September 20, 2006 is somehow evidence of retaliation. Plaintiff's memorandum at 17-18. That e-mail simply informs Witherstine that she will get the lay-off information from Dempsey, not that Day did not make the lay-off decisions. The last words in the e-mail are:"...we do not need anyone until further notice."  Plaintiff Exh. T. Plaintiff further argues that Ken Day's e-mail to Witherstine of August 24, 2006 is evidence of a retaliatory intent on Day's part. That e-mail summarizes the result of the meeting between Day, Messer, Dempsey, Moore and plaintiff which resulted in plaintiff being separated from Moore and Moore being transferred to day shift. Plaintiff Exh. G. As plaintiff had previously informed Day that Industrial Staffing was not aware of the circumstances when Industrial Staffing told her not to come back August 3, 2006, it is only natural, and a good business decision on Day's part, to keep Industrial Staffing aware of the steps defendant had taken to stop any alleged harassment.

plaintiff did establish a *prima facie* case of retaliation, plaintiff would then be required to put forth evidence that despite defendant's articulated reason for her dismissal, the real reason was retaliation. *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) "The heart of the pretext inquiry is not whether [the plaintiff] agrees with the reasons [the defendant] gives for the discharge, but whether [the defendant] really was motivated by those reasons." *Standard v. A.B.E.L. Serv. Inc.,* 161 F.3d 1318, 1333 (11th Cir. 1998).  At this stage, the plaintiff must "introduce significantly probative evidence showing the asserted reason is merely pretext for discrimination." *Zaben v. Air Products & Chems., Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997).

Plaintiff offers no evidence that suggests that American Tube's explanation for her dismissal warrants disbelief, nor that the decision-makers involved were in any way motivated by retaliation.  *See e.g., Standard v. A.B.E.L.,* 151 F.3d at 1333. Any inference of a retaliatory motive by the decision-makers involved in plaintiff's employment (Robert Dempsey or Ken Day) is refuted by their prompt actions in responding to and addressing plaintiff's complaint against Moore.

Plaintiff's personal conclusion that she was discriminated against, without evidence, is insufficient to create an issue of fact to show intent to discriminate. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996); *Perryman v. West,* 949 F. Supp. 815, 821 (M.D. Ala. 1996)(quoting *Blount v. Ala.*

21

*Cooperative Extension Service*, 869 F. Supp. 1543, 1553 (M.D. Ala. 1994)); *see also Coutu v. Martin Co. Bd. of Com'rs*, 47 F.3d 1068, 1073-74 (11th Cir.1995) ("[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext of intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its actions.").

As such the court can find no evidence of a pretextual motive by defendant. Although plaintiff argues that Bush's[8] testimony about overhearing a conversation between Aubrey Messer and Moore that they might have "to take action about it, possible lay her off" is evidence of a retaliatory intent on defendant's part, it is undisputed that neither Aubrey Messer nor Moore were the decision makers with respect to plaintiff's lay-off.  That decision was made solely by the plant manager, Ken Day.  Witherstine decl.¶ 27.  Moore never asked Ken Day to terminate plaintiff.  Moore depo. at 80.  Further, Moore never recommended to Dempsey that plaintiff be laid off. Moore depo. at  94. Additional evidence of **lack of** retaliatory intent on defendant's part is that managerial, permanent male employees were laid off as a result of the same decline in customer needs and therefore decline in production.

---

[8]Bush was a crane operator at defendant's plant. Bush depo. at 12, 67-68.

## V.  Conclusion

Having considered the foregoing, and finding that plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial on her claims against defendant pursuant to Title VII, the court **ORDERS** that the defendant's motion for summary judgment be and hereby is **GRANTED.** The court shall so rule by separate Order.

**DONE** and **ORDERED** this 30th day of June 2008.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE